# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. _____ |
| | ) | |
| v. | ) | |
| | ) | **13 CR 733** |
| WEATHERFORD INTERNATIONAL LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFERRED PROSECUTION AGREEMENT

Defendant WEATHERFORD INTERNATIONAL LTD. (the "Company"), by its undersigned representatives, pursuant to authority granted by the Company's Board of Directors, and the United States Department of Justice, Criminal Division, Fraud Section (the "Department"), enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.     The Company acknowledges and agrees that the Department will file the attached one count criminal Information in the United States District Court for the Southern District of Texas charging the Company with knowing failure to implement internal accounting controls, in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a).  In so doing, the Company: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives, for purposes of this Agreement and any charges by the United States arising

out of the conduct described in the attached Statement of Facts, any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Southern District of Texas.

2.     The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate. Should the Department pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any trial, guilty plea, or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

**<u>Term of the Agreement</u>**

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three (3) years and seven (7) calendar days from that date (the "Term"). The Company agrees, however, that, in the event that the Department determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Department, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Department's right to proceed as provided in Paragraphs 16 through 19 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship in Attachment D, or self-reporting period, if applicable, for an equivalent period. Conversely, in the event the Department finds, in its sole discretion, that there exists a change in circumstances

sufficient to eliminate the need for the corporate compliance monitor in Attachment D, or for self-reporting, whichever is in effect at the time, and that the other provisions of this Agreement have been satisfied, the Term of the Agreement may be terminated early.

### Relevant Considerations

4.      The Department enters into this Agreement based on the individual facts and circumstances presented by this case and the Company.  Among the facts considered were the following: (a) the Company's cooperation has been, on the whole, strong, including conducting an extensive worldwide internal investigation, voluntarily making U.S. and foreign employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the Department, including the production of more than 3.8 million pages of data; (b) the Company has engaged in extensive remediation, including terminating the employment of officers and employees responsible for the corrupt misconduct of its subsidiaries, establishing a Compliance Officer position that is a member of the Company's executive board, as well as a compliance office of approximately thirty-eight (38) full-time compliance professionals, including attorneys and accountants, that the Compliance Officer oversees, conducting more than thirty (30) anti-corruption compliance reviews in many of the countries in which it operates, enhancing its anti-corruption due diligence protocol for third-party agents and consultants, and retaining an ethics and compliance professional to conduct an assessment of the Company's ethics and compliance policies and procedures designed to ensure compliance with the FCPA and other applicable anti-corruption laws; (c) the Company has committed to continue enhancing its compliance program and internal accounting controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement; (d) the Company has already significantly enhanced, and is committed to continue to enhance, its

3

compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement; and (e) the Company has agreed to continue to cooperate with the Department in any ongoing investigation of the conduct of the Company and its officers, directors, employees, agents, and consultants relating to violations of the FCPA as provided in Paragraph 5 below.

     5.     The Company shall continue to cooperate fully with the Department in any and all matters relating to corrupt payments, false books and records, and the failure to implement or circumvention of internal accounting controls, subject to applicable law and regulations. At the request of the Department, the Company shall also cooperate fully with other domestic or foreign law enforcement authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its affiliates, or any of its present and former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to corrupt payments. The Company agrees that its cooperation shall include, but is not limited to, the following:

     a.     The Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants concerning all matters relating to corrupt payments about which the Company has any knowledge or about which the Department may inquire. This obligation of truthful disclosure includes the obligation of the Company to provide to the Department, upon request, any document, record or other tangible evidence relating to such corrupt payments about which the Department may inquire of the Company.

b.      Upon request of the Department, with respect to any issue relevant to its investigation of corrupt payments, false books and records, or the failure to implement or circumvention of internal accounting controls in connection with the operations of the Company, or any of its present or former subsidiaries or affiliates, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Department the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      With respect to any issue relevant to the Department's investigation of corrupt payments, related false books and records, and inadequate internal accounting controls in connection with the operations of the Company or any of its present or former subsidiaries or affiliates, the Company shall ensure that the Department is given access to all current and, to the extent possible, former directors, officers, employees, agents, and consultants of the Company for interviews and testimony in the United States.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Department pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, and the MDBs, of such materials as the Department, in its sole discretion, shall deem appropriate.

**Payment of Monetary Penalty**

6.      The Department and the Company agree that application of the United States

Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine

range yields the following analysis:

a.      The 2012 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 32, calculated as follows:

| | | |
|---|---|---|
| (a)(2) | Base Offense Level | 6 |
| (b)(1)(M) | Value of resulting gain more than $50,000,000 | +24 |
| (b)(10)(B) | Conduct outside the United States | + 2 |
| **TOTAL** | | 32 |

c.      <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), the base fine is $54,486,410, which represents the pecuniary gain to the organization from the offense and which is greater than the amount corresponding to offense level 32 in USSG § 8C2.4(d), which would be $17,500,000.

d.      <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1)(A) | The organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | + 5 |
| (g)(2) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | 8 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $54,486,410 |
| Multipliers | 1.6 (min)/3.2(max) |
| Fine Range | $87,178,256 / $174,356,512 |

The Company agrees to pay a monetary penalty in the amount of $87,178,256 to the United States Treasury within ten (10) business days of the Court's sentencing of Weatherford Services Ltd. ("WSL"), a wholly owned subsidiary of the Company, for FCPA-related violations. The Company and the Department agree that this fine is appropriate given the facts and circumstances of this case, including the extent and pervasiveness of the Company's criminal conduct, the Company's extensive cooperation, and its extensive remediation in this matter. The $87,178,256 penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Department that $87,178,256 is the maximum penalty that may be imposed in any future prosecution, and the Department is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Department agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Company acknowledges that no United States tax deduction may be sought in connection with the payment of any part of this $87,178,256 penalty. Finally, the parties agree that any criminal penalties that might be imposed by the Court on WSL in connection with WSL's guilty plea to a one-count Criminal Information charging WSL with violations of the FCPA, and the plea agreement entered into simultaneously herewith, will be deducted from the $87,178,256 penalty agreed to under this Agreement.

## Conditional Release from Liability

7.      Subject to Paragraph 16 through 19, the Department agrees, except as provided herein, that it will not bring any criminal or civil case against the Company related to the conduct described in the attached Statement of Facts or relating to information that the Company disclosed to the Department prior to the date on which this Agreement was signed. The Department, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code; provided that any such prosecution or other proceeding does not relate to any potentially obstructive conduct disclosed by the Company to the Department prior to the signing of this Agreement.

        a.      This Paragraph does not provide any protection against prosecution for any future conduct by the Company.

        b.      In addition, this Paragraph does not provide any protection against prosecution of any present or former officer, director, employee, shareholder, agent, consultant, contractor, or subcontractor of the Company for any violations committed by them.

## Corporate Compliance Program

8.      The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws throughout its operations, including those of its affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption.

Implementation of these policies and procedures shall not be construed in any future criminal proceeding initiated by the Department as providing immunity or amnesty for any crimes not disclosed to the Department as of the date of signing of this Agreement for which the Company would otherwise be responsible.

9.      In order to address any deficiencies in its internal accounting controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal accounting controls, policies, and procedures regarding compliance with the FCPA and other applicable anti-corruption laws.  If necessary and appropriate, the Company will adopt new or modify existing internal accounting controls, policies, and procedures in order to ensure that the Company maintains:  (a) a system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, standards, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  The internal accounting controls system and compliance code, standards, and procedures will include, but not be limited to, the minimum elements set forth in Attachment C, which is incorporated by reference into this Agreement.

## Corporate Compliance Monitor

10.     Promptly after the Department's selection pursuant to Paragraph 11 below, the Company agrees to retain an independent compliance monitor (the "Monitor").  Within thirty (30) calendar days after the execution of this Agreement, and after consultation with the Department, the Company will propose to the Department a pool of three (3) qualified candidates to serve as the Monitor.  If the Department determines, in its sole discretion, that any

of the candidates are not, in fact, qualified to serve as the Monitor, or if the Department, in its

sole discretion, is not satisfied with the candidates proposed, the Department reserves the right to

seek additional nominations from the Company.  The Monitor candidates shall have, at a

minimum, the following qualifications:

   a. demonstrated expertise with respect to the FCPA and other applicable

anti-corruption laws, including experience counseling on FCPA issues;

   b. experience designing and/or reviewing corporate compliance policies,

procedures and internal accounting controls, including FCPA and anti-corruption policies,

procedures and internal accounting controls;

   c. the ability to access and deploy resources as necessary to discharge the

Monitor's duties as described in the Agreement; and

   d. sufficient independence from the Company to ensure effective and

impartial performance of the Monitor's duties as described in the Agreement.

  11. The Department retains the right, in its sole discretion, to accept or reject any

Monitor candidate proposed by the Company, though the Company may express its preference(s)

among the candidates.  In the event the Department rejects all proposed Monitors, the Company

shall propose a pool of three (3) additional qualified candidates within ten (10) calendar days

after receiving notice of the rejection.  This process shall continue until a Monitor acceptable to

both parties is chosen.  The Department and the Company will use their best efforts to complete

the selection process within sixty (60) calendar days of the filing of the Agreement and the

accompanying Information.  If the Monitor resigns or is otherwise unable to fulfill his or her

obligations as set out herein and in Attachment D, the Company shall within thirty (30) calendar

days recommend a pool of three (3) qualified Monitor candidates from which the Department

will choose a replacement.  The Company may again express its preference(s) among the candidates.

12.     The Monitor will be retained by the Company for a period of not less than eighteen (18) months from the date the Monitor is selected, unless the term of the Monitor is terminated early pursuant to Paragraph 3.  The term of the monitorship, including the circumstances that may support an extension of the term, as well as the Monitor's powers, duties, and responsibilities will be as set forth in Attachment D.  The Company agrees that it will not employ or be affiliated with the Monitor for a period of not less than one (1) year from the date on which the Monitor's term expires.  Nor will the Company discuss with the Monitor the possibility of employment or affiliation during the Monitor's term.

13.     At the end of the monitorship, provided all requirements set forth in Paragraphs 19 and 20 of Attachment D are met, the Company will report on its compliance to the Department periodically, at no less than nine-month intervals, for the remainder of this Agreement, regarding remediation and implementation of the enhanced compliance measures set forth by the Monitor as described in Paragraph 20 and 21 of Attachment D.  The Company shall maintain a senior company officer as the person responsible for overseeing the Company's corporate compliance reporting obligations.  Should the Company discover credible evidence that potentially corrupt payments or potentially corrupt transfers of property or interests may have been offered, promised, paid, or authorized by any Company entity or person, or any entity or person working directly for the Company, or that related false books and records have been maintained, the Company shall promptly report such conduct to the Department.  During this period, the Company shall conduct and prepare at least two follow-up reviews and reports, as described below:

a.      The Company shall undertake follow-up reviews at nine-month intervals, each incorporating the Department's views and comments on the Company's prior reviews and reports, to determine whether the policies and procedures of the Company are reasonably designed to detect and prevent violations of the FCPA and other applicable anticorruption laws. Reports shall be transmitted to Deputy Chief - FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Bond Building, Eleventh Floor, Washington, DC 20005.

b.      The first follow-up review and report shall be completed by no later than two-hundred-seventy (270) calendar days after the approval by the Department of the enhanced compliance measures described in Paragraph 20 of Attachment D.   The subsequent follow-up review and report shall be completed by no later than two-hundred-seventy (270) calendar days after the completion of the first follow-up review.

c.      The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Department.

### Deferred Prosecution

14.      In consideration of: (a) the past and future cooperation of the Company described in Paragraphs 4 and 5 above; (b) the Company's payment of a criminal penalty of $87,178,256; and (c) the Company's implementation and maintenance of remedial measures as described in Paragraphs 8 through 9 above, the Department agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts, and for the conduct that the Company disclosed to the Department prior to the signing of this Agreement, be and hereby is deferred for the Term of this Agreement.

15.     The Department further agrees that if the Company fully complies with all of its obligations under this Agreement, the Department will not continue the criminal prosecution described in Paragraph 1 against the Company or its subsidiaries, and, at the conclusion of the Term, this Agreement shall expire.  Within thirty (30) days of the Agreement's expiration, the Department shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1.

## Breach of the Agreement

16.     If, during the Term of this Agreement, the Department determines, in its sole discretion, that the Company has breached the agreement by (a) committing any felony under U.S. federal law subsequent to the signing of this Agreement, (b) at any time providing in connection with this Agreement deliberately false, incomplete, or misleading information, (c) failing to cooperate as set forth in Paragraph 5 of this Agreement, (d) failing to implement a compliance program as set forth in Paragraphs 8 and 9 of this Agreement and Attachment C, (e) committing acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA, or (f) otherwise failing specifically to perform or to fulfill completely each and every one of the Company's obligations under the Agreement, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Department has knowledge, including the charges in the Information described in Paragraph 1, which may be pursued by the Department in the U.S. District Court for the Southern District of Texas or any other appropriate venue.  Any such prosecution may be premised on information provided by the Company.  Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company notwithstanding the expiration of the statute of limitations between the signing of this Agreement

and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company

agrees that the statute of limitations with respect to any such prosecution that is not time-barred

on the date of the signing of this Agreement shall be tolled for the Term plus one year.

17.     In the event that the Department determines that the Company has breached this

Agreement, the Department agrees to provide the Company with written notice of such breach

prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt

of such notice, the Company shall have the opportunity to respond to the Department in writing

to explain the nature and circumstances of such breach, as well as the actions the Company has

taken to address and remediate the situation, which explanation the Department shall consider in

determining whether to institute a prosecution.

18.     In the event that the Department determines that the Company has breached this

Agreement: (a) all statements made by or on behalf of the Company to the Department or to the

Court, including the attached Statement of Facts, and any testimony given by the Company

before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or

subsequent to this Agreement, and any leads derived from such statements or testimony, shall be

admissible in evidence in any and all criminal proceedings brought by the Department against

the Company; and (b) the Company shall not assert any claim under the United States

Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal

Rules of Evidence, or any other federal rule that statements made by or on behalf of the

Company prior or subsequent to this Agreement, or any leads derived therefrom, should be

suppressed or are otherwise inadmissible. The decision whether conduct or statements of any

current director or employee, or any person acting on behalf of, or at the direction of, the

Company will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Department.

19.     The Company acknowledges that the Department has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

### Sale or Merger of Company

20.     The Company agrees that in the event it sells, merges, or transfers all or substantially all of its business operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

### Public Statements by Company

21.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 16 through 19 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this

Agreement shall be at the sole discretion of the Department. If the Department determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Department shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Company shall be permitted to contest liability, raise defenses, assert affirmative claims, and otherwise take legal positions in other proceedings relating to the matters set forth in the Statement of Facts provided that such legal positions do not contradict, in whole or in part, any statement contained in the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

22.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult the Department to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Department and the Company; and (b) whether the Department has no objection to the release. Nothing in Paragraphs 21 or 22 restricts the Company from fulfilling its obligations under the federal securities laws or restricts the Company from interacting with investors.

23.     The Department agrees, if requested to do so, to bring to the attention of governmental and other debarment authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to debarment authorities,

the Department is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by the debarment authorities.

**Limitations on Binding Effect of Agreement**

24.     This Agreement is binding on the Company and the Department but specifically does not bind any other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Department will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

**Notice**

25.     Any notice to the Department under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, Eleventh Floor, 1400 New York Avenue, N.W., Washington, D.C. 20005. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to F. Joseph Warin, Esq., Gibson, Dunn, & Crutcher LLP, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036. Notice shall be effective upon actual receipt by the Department or the Company.

**Complete Agreement**

26.     This Agreement sets forth all the terms of the agreement between the Company and the Department. No amendments, modifications or additions to this Agreement shall be

valid unless they are in writing and signed by the Department, the attorneys for the Company, and a duly authorized representative of the Company.

**AGREED:**

**FOR WEATHERFORD INTERNATIONAL LTD.:**

Date: November 25, 2013          By: _____

Alejandro Cestero
Vice President, Co-General Counsel and
Corporate Secretary
Weatherford International Ltd.


Date: November 25, 2013          By: _____

F. Joseph Warin
Michael J. Edney
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500


**FOR THE DEPARTMENT OF JUSTICE:**

Jeffrey H. Knox
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: November 25, 2013          BY: _____

Jason Linder
Trial Attorney

18

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for WEATHERFORD INTERNATIONAL LTD. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Vice President, Co-General Counsel and Corporate Secretary for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: November 25, 2013

WEATHERFORD INTERNATIONAL LTD.

By: _____

Alejandro Cestero
Vice President, Co-General Counsel and Corporate Secretary
WEATHERFORD INTERNATIONAL LTD.

## CERTIFICATE OF COUNSEL

I am counsel for WEATHERFORD INTERNATIONAL LTD. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Vice President, Co-General Counsel and Corporate Secretary of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: November 25, 2013

By: _____
F. Joseph Warin
Michael J. Edney
GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20036
(202) 955-8500
Counsel for WEATHERFORD INTERNATIONAL LTD.

ATTACHMENT A

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the

Deferred Prosecution Agreement (the "Agreement") between the United States Department of

Justice, Criminal Division, Fraud Section (the "Department") and WEATHERFORD

INTERNATIONAL LTD. ("WEATHERFORD").   WEATHERFORD hereby agrees and

stipulates that the following information is true and accurate.  WEATHERFORD admits,

accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees,

and agents as set forth below.  Should the Department pursue the prosecution that is deferred by

this Agreement, WEATHERFORD agrees that it will neither contest the admissibility of, nor

contradict, this Statement of Facts in any such proceeding.  If this matter were to proceed to trial,

the Department would prove beyond a reasonable doubt, by admissible evidence, the facts

alleged below and set forth in the criminal Information attached to this Agreement.  This

evidence would establish the following:

2.      Defendant WEATHERFORD INTERNATIONAL LTD. ("WEATHERFORD")

was a multinational corporation that provided equipment and services to the oil industry.

WEATHERFORD employed more than 50,000 employees and operated in more than 100

countries.  Prior to March 2009, WEATHERFORD was incorporated in Bermuda and

headquartered in Houston, Texas, in the Southern District of Texas.  As of March 2009,

WEATHERFORD was incorporated and headquartered in Switzerland, although it maintained a

significant presence in Houston, Texas.

3.      From at least in or around 1998 until the filing of this Information, WEATHERFORD issued and maintained a class of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*) and was required to file periodic reports with the U.S. Securities and Exchange Commission ("SEC") under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m).  Accordingly, WEATHERFORD was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1. WEATHERFORD's shares traded on the New York Stock Exchange under the symbol "WFT."

4.      WEATHERFORD was a complex organization, comprising more than 500 legal entities.

5.      Weatherford Services, Ltd. ("WSL") was a wholly owned subsidiary of WEATHERFORD and was incorporated in Bermuda.  Among other functional responsibilities, WSL managed many of WEATHERFORD's activities in West Africa.  WSL had between 886 employees (in 2005) and 1,298 employees (in 2007).  WSL was also subject to WEATHERFORD's internal accounting controls, and WSL's financial results were included in the consolidated financial statements that WEATHERFORD filed with the SEC.

6.      Weatherford Oil Tool Middle East Limited ("WOTME") was a wholly owned subsidiary of WEATHERFORD and was incorporated in the British Virgin Islands and headquartered in Dubai.  Among other functional responsibilities, WOTME managed most of WEATHERFORD's activities in North Africa and the Middle East.  WOTME was also subject to WEATHERFORD's internal accounting controls, and WOTME's financial results were included in the consolidated financial statements that WEATHERFORD filed with the SEC.

### *WEATHERFORD's Internal Accounting Controls*

7.      WEATHERFORD, which operated in an industry with a substantial corruption risk profile, grew its global footprint in large part by purchasing existing companies, often themselves in countries with high corruption risks.  Despite these manifest corruption risks, WEATHERFORD knowingly failed to establish effective corruption-related internal accounting controls designed to detect and prevent corruption-related violations, including FCPA violations, prior to 2008.

8.      Prior to 2008, WEATHERFORD failed to institute effective internal accounting controls, including corruption-related due diligence on appropriate third parties and business transactions, limits of authority, and documentation requirements.  This failure was particularly acute when it came to third parties, including channel partners, distributors, consultants, and agents.  WEATHERFORD failed to establish effective corruption-related due diligence on third parties with interaction with government officials, such as appropriately understanding a given third party's ownership and qualifications, evaluating the business justification for the third party's retention in the first instance, and establishing and implementing adequate screening of third parties for derogatory information.  Moreover, WEATHERFORD failed to implement effective controls for the meaningful approval process of third parties.  WEATHERFORD also did not require, in practice, adequate documentation supporting retention and in support of payments to third parties, such as appropriate invoices and purchase orders.

9.      Prior to 2008, WEATHERFORD did not have adequate internal accounting controls and processes in place that effectively evaluated business transactions, including acquisitions and joint ventures, for corruption risks and to investigate those risks when detected.

A-3

Moreover, following the establishment of joint ventures and certain other business transactions, WEATHERFORD did not appropriately implement its policies and procedures to ensure an effective internal accounting control environment through proper integration.

10.     Prior to 2008, WEATHERFORD also did not have an effective internal accounting control system for gifts, travel, and entertainment.  In practice, expenses were not typically adequately vetted to ensure that they were reasonable, bona fide, or properly documented.

11.     These issues were exacerbated by the fact that, prior to 2008, a company as large and complex as WEATHERFORD – with its substantial risk profile – did not have a dedicated compliance officer or compliance personnel.  Although WEATHERFORD promulgated an anti-corruption policy that it made available on its internal website, it did not translate that policy into any language other than English, and it did not conduct anti-corruption training.

12.     Prior to 2008, WEATHERFORD did not have an effective system for investigating employee reporting of ethics and compliance violations.  If an employee's ethics questionnaire response indicated an awareness of payments or offers of payments to foreign officials or of undisclosed or unallocated funds, WEATHERFORD did not have a protocol in place to perform any further investigation into the alleged corruption. As a matter of practice, in fact, WEATHERFORD did not conduct additional investigation of such allegations.  Prior to 2004, WEATHERFORD did not require any employee to complete any kind of ethics questionnaire.

13.     Further, WEATHERFORD lacked effective mechanisms to control its many foreign subsidiaries' activities to ensure that they maintained internal accounting controls adequate to detect, investigate, or deter corrupt payments made to government officials.

### *Corrupt Conduct*

14.     Due to WEATHERFORD's failure to implement such internal accounting controls, a permissive and uncontrolled environment existed within WEATHERFORD in which employees of certain of its wholly owned subsidiaries in Africa and the Middle East were able to engage in various corrupt conduct over the course of many years, including both bribery of foreign officials and fraudulent misuse of the United Nations' Oil for Food Program.

15.     In one bribery scheme in Africa, employees of a wholly owned subsidiary of WEATHERFORD, WSL, established and operated a joint venture with two local entities controlled by certain foreign officials and their relatives from 2004 through at least 2008.  The foreign officials selected the entities with which WSL would partner, and WSL and WEATHERFORD employees knew from the outset of discussions regarding the joint venture that the members of the local entities included foreign officials' relatives and associates.

16.     In October 2004, the foreign officials came to WEATHERFORD's headquarters in Houston, Texas, in the Southern District of Texas, to negotiate the terms of the joint venture with employees of WSL and WEATHERFORD.  They were not accompanied by the nominal members of either local entity.  In July 2005, a WEATHERFORD executive and legal counsel met with the foreign officials in London, England, to negotiate further the terms of the joint venture.  Again, the nominal members of the local entities did not accompany the foreign officials.

17.     Prior to entering into the joint venture, neither WEATHERFORD nor WSL conducted any meaningful due diligence of either joint venture partner.  In July 2005, one of WEATHERFORD's in-house legal counsel, in fact, falsely represented to an outside law firm that the joint venture had been vetted and approved by other outside counsel, when, in fact, no outside law firm ever conducted such vetting or gave such approval.

18.     In September 2006, after the joint venture had been formed and was operational, a high level WEATHERFORD executive called for a meeting with the "'real' partners" in the joint ventures: the foreign officials.  As a result, he and several other WSL and WEATHERFORD employees met with the foreign officials and their relatives in Paris.  WSL arranged and paid for all attendees' travel and hotel accommodations.

19.     Despite the fact that the local entities did not contribute capital, expertise, or labor to the joint venture, neither WSL nor WEATHERFORD investigated why the local entities were involved in the joint venture.  The sole purpose of those local entities, in fact, was to serve as conduits through which WSL funneled hundreds of thousands of dollars in payments to the foreign officials controlling them.  Prior to the distribution of joint venture dividends, WSL executives knew that foreign officials were directing the distribution of those dividends.  For example, in a September 2007 email, a foreign official provided a WSL executive with one of the local entity's bank account details.

20.     In exchange for the payments they received from WSL through the joint venture, the foreign officials awarded the joint venture lucrative contracts, gave WSL inside information about competitors' pricing, and took contracts away from WSL's competitors and awarded them to the joint venture.

A-6

21.    In another bribery scheme in Africa, WSL employees bribed a foreign official so that he would approve the renewal of a contract under which the subsidiary had been providing oil services to another non-governmental company.  Local law in that country required that the contract renewal be approved by an instrumentality of the national government.

22.    WSL funneled bribery payments to the foreign official with the authority to approve the contract through a freight forwarding agent it retained via a consultancy agreement in July 2006.  Prior to entering into the consultancy agreement with the freight forwarding agent, neither WEATHERFORD nor WSL conducted any anti-corruption due diligence of the agent.  Indeed, the agent refused to sign an initial draft of the consultancy agreement prohibiting giving anything of value to a government official.

23.    WSL generated sham purchase orders for consulting services the freight forwarding agent never performed, and the freight forwarding agent, in turn, generated sham invoices for those same nonexistent services.  When paid for those invoices, the freight forwarding agent passed at least some of those monies on to the foreign official with the authority to approve WSL's contract renewal.  In exchange for these payments, the foreign official awarded the renewal contract to WSL in 2006.

24.    In another scheme, in the Middle East, from 2005 through 2011, employees of another WEATHERFORD subsidiary, WOTME, awarded improper "volume discounts" to a distributor who supplied WEATHERFORD products to a government-owned national oil company, believing that those discounts were being used to create a slush fund with which to make bribe payments to decisionmakers at the national oil company.

25.     At a meeting in 2001, officials at the national oil company had directed WOTME to sell goods to the company through this particular distributor. Prior to entering into the contract with the distributor, neither WOTME nor WEATHERFORD conducted any due diligence on the distributor, despite: (a) the fact that the Distributor would be furnishing WEATHERFORD goods directly to an instrumentality of a foreign government; (b) the fact that a foreign official had specifically directed WOTME to contract with that particular distributor, and (c) the fact that executives at WOTME knew that a member of the country's royal family had an ownership interest in the distributor.

26.     These volume discounts, which provided a five to ten percent discount on each sale of the covered product lines, were not an official contractual item included in any contract between WOTME and the distributor.  Managers at the subsidiary were involved in negotiating and approving the volume discounts given to the distributor.

27.     In September 2006 correspondence, the president and CEO of the distributor wrote to WOTME managers to reject a proposal that the volume discount should be reduced:

> Yes, I agree that we should not risk our relationship with [the national oil company].  However your suggestion will do exactly that; it is not purchasing but our friends who will be directly impacted.  They and not purchasing, are in a position to influence the agreement and control the generation, direction and volume of business we and others receive, and as such the volume discount may not be subject to negotiations.

28.     Between 2005 and 2011, WOTME paid approximately $15 million in volume discounts to the distributor.  These were recorded in WOTME's general ledger under a heading titled "Volume Discount Account."

29.     In another scheme in the Middle East, WEATHERFORD's failure to implement effective internal accounting controls also permitted corrupt conduct relating to the United

A-8

Nation's Oil for Food Program ("OFFP").  Under the program, the government of Iraq was allowed to sell its oil, so long as the proceeds were used to purchase humanitarian supplies, including but not limited to food, for the Iraqi people.  Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.  The OFFP continued from in or about December 1996 until the United States' invasion of Iraq on or about March 19, 2003.

30.     Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government.  These kickbacks violated U.N. OFFP regulations and U.N. sanctions, which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by the guidelines of the OFFP.

31.     Between in or about February 2002 and in or about July 2002, WOTME paid approximately $1,470,128 in kickbacks to the government of Iraq on nine contracts with Iraq's Ministry of Oil, as well as other ministries, to provide oil drilling and refining equipment. WOTME falsely recorded these kickbacks as other, seemingly legitimate, types of costs and fees. Further, WOTME concealed the kickbacks from the U.N. by inflating contract prices by 10%.

32.     WOTME managers authorized the kickbacks and signed at least two side letters with the Iraqi government agreeing to pay them.  In addition, a WOTME manager personally paid approximately $18,465 in kickback payments, and was later reimbursed by the subsidiary.

A-9

*Profits from the Corrupt Conduct in Africa and the Middle East*

33.     Due to WEATHERFORD's failure to implement internal accounting controls, an environment existed within WEATHERFORD in which employees of certain of its wholly owned subsidiaries in Africa and the Middle East were able to engage in various corrupt business transactions, which conduct earned profits of $54,486,410, which were included in the consolidated financial statements that WEATHERFORD filed with the SEC.

A-10

ATTACHMENT B

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, WEATHERFORD INTERNATIONAL LTD. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Department") regarding issues arising in relation to the Company's failure to implement internal accounting controls;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Department; and

WHEREAS, the Company's counsel has advised the Board of Directors of the Company (the "Board") of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Department;

The undersigned certifies that the Board has resolved that:

1.      The Vice President, Co-General Counsel and Corporate Secretary of the Company, Alejandro Cestero, is authorized, empowered and directed, on behalf of the Company, to execute the deferred prosecution agreement and other documents necessary to resolve issues relating to the alleged failure to implement internal accounting controls, substantially in such form and with such features as briefed to the Board, including (a) the filing of a deferred one-count Information charging the Company with criminal violation of 18 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff(a); (b) the waiving of indictment on such charges; (c) the accepting of monetary criminal penalties against the Company totaling $87,178,256, with respect to the conduct described in the Information; and (d) the waiving of certain substantive and procedural rights and defenses as described in the deferred prosecution agreement; and

2.     The Vice President, Co-General Counsel and Corporate Secretary of the Company, Alejandro Cestero, is authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolution.


Date: November 25, 2013


By:   _____
      Charity R. Kohl
      Assistant Secretary
      WEATHERFORD INTERNATIONAL LTD.

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal accounting controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* and other applicable anti-corruption laws, WEATHERFORD INTERNATIONAL LTD. (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal accounting controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new or to modify existing internal accounting controls, compliance code, policies, and procedures in order to ensure that it maintains:  (a) a system of internal accounting controls designed to ensure that the Company makes and keeps fair and accurate books, records, and accounts; and (b) a rigorous anti-corruption compliance code, policies, and procedures designed to detect and deter violations of the FCPA and other applicable anti-corruption laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal accounting controls, compliance code, policies, and procedures:

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption laws and its compliance code.  The Company will further ensure that the members of the Board of Directors and senior management are committed to and, to the extent appropriate to their positions, effectively implement the corporate compliance program described

C-1

herein, and the Company shall take appropriate measures if they fail to fulfill these responsibilities.

*Policies and Procedures*

2.       The Company will maintain, or where necessary establish, a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,"), which policy shall be memorialized in a written compliance code.

3.       The Company will maintain, or where necessary establish, compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws by personnel at all levels of the Company.  These anti-corruption policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address:

   a.       gifts;

   b.       hospitality, entertainment, and expenses;

   c.       customer travel;

C-2

        d.      political contributions;

        e.      charitable donations and sponsorships;

        f.      facilitation payments; and

        g.      solicitation and extortion.

4.      The Company will ensure that it has a system of financial and accounting procedures, including a system of internal accounting controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts to ensure that they cannot be used for the purpose of foreign bribery or concealing such bribery.  This system should be designed to provide reasonable assurances that:

        a.      transactions are executed in accordance with management's general or specific authorization;

        b.      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

        c.      access to assets is permitted only in accordance with management's general or specific authorization; and

        d.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery risks facing the Company, including, but not limited to, its geographical

organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

8.      The Company will maintain, or where necessary establish, mechanisms designed to ensure that its anti-corruption compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, and positions that otherwise pose a

C-4

corruption risk to the Company, including internal audit, accounting, finance, sales, marketing, procurement, legal, compliance, government relations, travel, licensing, permitting, and customs, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption compliance code, policies, and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

11.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the anti-corruption laws or the Company's anti-corruption compliance code, policies, and procedures.

*Enforcement and Discipline*

12.    The Company will maintain, or where necessary establish, mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.    The Company will maintain, or where necessary establish, appropriate disciplinary procedures to address, among other things, violations of the anti-corruption laws and the Company's anti-corruption compliance code, policies, and procedures by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall maintain, or where necessary establish, procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal accounting controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall anti-corruption compliance program is effective.

*Third-Party Relationships*

14.    The Company will maintain, or where necessary establish, risk-based appropriate due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption laws, and of the Company's anti-corruption compliance code, policies, and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.

15.      Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of the anti-corruption laws, which may, depending upon the circumstances, include:  (a) anti-corruption representations and undertakings relating to compliance with the anti-corruption laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.      The Company will maintain, or where necessary establish, policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption due diligence by legal, accounting, and compliance personnel.  If the Company discovers any corrupt payments or inadequate internal accounting controls as part of its due diligence of newly acquired entities or entities merged with the Company, it shall report such conduct to the Department.

17.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the anti-corruption laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

        a.     train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

        b.     conduct a risk assessment and, where appropriate, an FCPA-specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.     The Company will conduct periodic reviews and testing of its anti-corruption compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption laws and the Company's anti-corruption code, policies, and procedures, taking into account relevant developments in the field and evolving international and industry standards.

ATTACHMENT D

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of WEATHERFORD INTERNATIONAL LTD. (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the Department of Justice (the "Department"), are as described below:

1.      The Company will retain the Monitor for a period of not less than eighteen (18) months (the "Term of the Monitorship"), unless the early termination provisions of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.  Subject to certain conditions specified below that would, in the sole discretion of the Department, allow for an extension of the Term of the Monitorship, the Monitor shall be retained until the criteria in Paragraphs 19-21 below are satisfied or the Agreement expires, whichever occurs first.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal accounting controls, record-keeping, and financial reporting policies and procedures of the Company as they relate to the Company's current and ongoing compliance with the FCPA and other applicable anti-corruption laws (collectively, the "anti-corruption laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include

an assessment of the Board of Directors' and senior management's commitment to, and effective
implementation of, the corporate compliance program described in Attachment C of the
Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have
the authority to take such reasonable steps as, in his or her view, may be necessary to be fully
informed about the Company's compliance program in accordance with the principles set forth
herein and applicable law, including applicable data protection and labor laws and regulations.
To that end, the Company shall: facilitate the Monitor's access to the Company's documents and
resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on
applicable local law (such as relevant data protection and labor laws).  The Company shall
provide the Monitor with access to all information, documents, records, facilities, and
employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of
the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor
with access to the Company's former employees and its third-party vendors, agents, and
consultants.

4.      Any disclosure by the Company to the Monitor concerning corrupt payments,
false books and records, and internal accounting control failures shall not relieve the Company of
any otherwise applicable obligation to truthfully disclose such matters to the Department,
pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Department.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Department may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the

Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the countries and industries in which the Company operates; (b) current and future business opportunities and transactions; (c) current and announced business partners, including third parties and joint ventures, and the business rationale for such relationships; (d) the Company's gifts, travel, and entertainment interactions with foreign officials; and (e) the Company's involvement with foreign officials, including the amount of foreign government regulation and oversight of the Company, such as licensing and permitting, and the Company's exposure to customs and immigration issues in conducting its business affairs.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current anti-corruption policies and procedures; (b) on-site observation of selected systems and procedures of the Company at sample sites, including internal accounting controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least one follow-up review and report as described in Paragraphs 16-18 below.  With respect to the initial report, after consultation with the Company and the Department, the Monitor shall prepare the first written work plan within thirty (30) calendar days of being retained, and the Company and the Department shall provide comments within fifteen (15) calendar days after receipt of the written work plan.  With respect to each follow-up report, after consultation with the Company and the Department, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Department shall provide comments within fifteen (15) calendar days after receipt of the written work plan.  Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Department in its sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement.  In developing such understanding the Monitor is to rely to the extent possible on available information and documents provided by the Company.  It is not intended that the

Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.     The initial review shall commence no later than sixty (60) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Department).  The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with the anti-corruption laws.  The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with the Company and the Department prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Department.

D-6

13.     Within ninety (90) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within fifteen (15) calendar days of receiving the report, the Company notifies in writing the Monitor and the Department of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the ninety (90) calendar days of receiving the report but shall propose in writing to the Monitor and the Department an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within fifteen (15) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Department. The Department may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Department.

*Follow-Up Review*

16.     The follow-up review shall commence no later than ninety (90) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Department).  The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  The Monitor shall also certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the anti-corruption laws.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Department.

17.     Within ninety (90) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within fifteen (15) calendar days after receiving the report, the Company notifies in writing the Monitor and the Department concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the ninety (90) calendar days of receiving the report but shall propose in writing to the Monitor and the Department an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within fifteen (15) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Department.  The Department may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

*Certification of Compliance*
*and Termination of the Monitorship*

19.     At the conclusion of the ninety (90) calendar day period following the issuance of the follow-up report, if the Monitor believes that the Company's compliance program is reasonably designed and implemented to detect and prevent violations of the anti-corruption laws and is functioning effectively, the Monitor shall certify the Company's compliance with its compliance obligations under the Agreement.  The Monitor shall then submit to the Department a written report ("Certification Report") within sixty (60) calendar days.  The Certification Report shall set forth an overview of the Company's remediation efforts to date, including the implementation status of the Monitor's recommendations and an assessment of the sustainability of the Company's remediation efforts.  The Certification Report should also recommend the scope of the Company's future self-reporting.  Also at the conclusion of the ninety (90) calendar day period following the issuance of the follow-up report, the Company shall certify in writing to the Department, with a copy to the Monitor, that the Company has adopted and has implemented, or is implementing on an agreed-to schedule, all of the Monitor's recommendations in the initial and follow-up report(s), or the agreed-upon alternatives.  The Monitor or the Company may

extend the time period for issuance of the Certification Report or the Company's certification, respectively, with prior written approval of the Department.

20.     At such time as the Department approves the Certification Report and the Company's certification, the monitorship shall be terminated, and the Company will be permitted to self-report to the Department on its enhanced compliance obligations for the remainder of the term of the Agreement.  The Department, however, reserves the right to terminate the monitorship absent certification by the Monitor, upon a showing by the Company that termination is, nevertheless, in the interests of justice.

21.     If permitted to self-report to the Department, the Company shall thereafter submit to the Department a written report every six (6) months setting forth a complete description of its remediation efforts to date, its proposals to improve the Company's internal accounting controls, policies, and procedures for ensuring compliance with the anti-corruption laws, and the proposed scope of the subsequent reviews.  The report shall be transmitted to the Deputy Chief – FCPA Unit, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005.  The Company may extend the time period for issuance of the self-report with prior written approval of the Department.

*Extension of the Term of the Monitorship*

22.     If, however, at the conclusion of the ninety (90) calendar-day period following the issuance of the follow-up report, the Department concludes that the Company has not by that time successfully satisfied its compliance obligations under the Agreement, the Term of the Monitorship shall be extended for one year.

23.     Under such circumstances, the Monitor shall commence the second follow-up review no later than sixty (60) calendar days after the Department concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Department).  The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the second follow-up review in the same fashion as set forth in Paragraph 12 with respect to the initial review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.  A determination to terminate the monitorship shall then be made in accordance with Paragraphs 19-21.

24.     If, after completing the second follow-up review, the Department again concludes that the Company has not successfully satisfied its obligations under the Agreement with respect to the Monitor's Mandate, the Term of the Monitorship shall be extended until expiration of the Agreement, and the Monitor shall commence a third follow-up review within sixty (60) calendar days after the Department concludes that the Company has not successfully satisfied its compliance obligations under the Agreement (unless otherwise agreed by the Company, the Monitor, and the Department).  The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the third follow-up review in the same fashion as set forth in Paragraph 12 with respect to the initial review and in accordance with the procedures for follow-up reports set forth in Paragraphs 16-18.

*Monitor's Discovery of Misconduct*

25.     Should the Monitor, during the course of his or her engagement, discover that:

- corrupt or otherwise suspicious payments (or transfers of property or interests) may have been offered, promised, made, or authorized by any entity or person within the Company or any entity or person working, directly or indirectly, for or on behalf of the Company; or

- false books and records may have been maintained by the Company

either (a) after the date on which this Agreement was signed or (b) that have not been adequately dealt with by the Company (collectively "improper activities"), the Monitor shall promptly report such improper activities to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action. If the Monitor believes that any improper activities may constitute a violation of law, the Monitor also shall report such improper activities to the Department. The Monitor should disclose improper activities in his or her discretion directly to the Department, and not to the Company, only if the Monitor believes that disclosure to the Company would be inappropriate under the circumstances, and in such case should disclose the improper activities to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company as promptly and completely as the Monitor deems appropriate under the circumstances. The Monitor shall address in his or her reports the appropriateness of the Company's response to all improper activities, whether previously disclosed to the Department or not. Further, in the event that the Company, or any entity or person working directly or indirectly for or on behalf of the Company, withholds information necessary for the performance of the Monitor's responsibilities, if the Monitor believes that such withholding is without just

cause, the Monitor shall disclose that fact to the Department.  The Company shall not take any action to retaliate against the Monitor for any such disclosures or for any other reason.  The Monitor may report any criminal or regulatory violations by the Company or any other entity discovered in the course of performing his or her duties, in the same manner as described above.

*Meetings During Pendency of Monitorship*

26.     The Monitor shall meet with the Department within thirty (30) calendar days after providing each report to the Department to discuss the report, to be followed by a meeting between the Department, the Monitor, and the Company.

27.     At least annually, and more frequently if appropriate, representatives from the Company and the Department will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Department, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

28.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Department determines in its sole discretion that disclosure would be in furtherance of the Department's discharge of its duties and responsibilities or is otherwise required by law.